**STATE of Minnesota, Respondent,**

v.

**Peter James SHOEN, Appellant.**

**No. CX–98–1661.**

Supreme Court of Minnesota.

July 29, 1999.

John M. Stuart, State Public Defender, Ann McCaughan, Asst. State Public Defender, Minneapolis, for appellant.

Michael A. Hatch, Atty. Gen., Thomas R. Ragatz, Asst. Atty. Gen., LaMar Piper, Watonwan County Atty., St. James, for respondent.

## OPINION

PAUL H. ANDERSON, Justice.

In November 1996, appellant Peter James Shoen was found guilty of first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (1998) for killing his wife. On his first appeal to this court, we determined that the district court erred when it ordered Shoen to wear a leg restraint throughout trial without making appropriate findings to support its decision. *See State v. Shoen (Shoen I )*, 578 N.W.2d 708, 714–15 (Minn.1998). Concluding that the record was insufficient to

indicate whether the jury had seen or was prejudiced by Shoen's restraint, we remanded the case for a *Schwartz* hearing. *See id.* at 715–16. After conducting two *Schwartz* hearings, in which 11 of the original 12 jurors testified, the district court concluded that the guilty verdict was "surely unattributable" to Shoen's restraint and, therefore, the erroneous restraint of Shoen was harmless. We affirm.

The facts essential to the issue now before us are set forth as follows. Additional facts concerning Kimberly Shoen's killing and Peter Shoen's first trial are contained in *Shoen I*, 578 N.W.2d 708.

It is undisputed that on March 1, 1996, appellant Peter James Shoen (Shoen) killed Kimberly Shoen (Kimberly), his wife of nine years. After initially denying that he killed Kimberly, Shoen confessed to the crime in an interview with law enforcement investigators on March 2, 1996. Shoen told the investigators that on March 1 he and Kimberly began arguing about his continued friendship with a woman with whom Shoen had previously had an affair. Shoen said that during the argument, Kimberly threatened to leave him and take everything he had, including their children and the farm. He said that Kimberly then shoved him and, in response, he pushed her and she fell down the stairs and hit her head. Shoen said that within seconds after observing Kimberly motionless and bleeding at the bottom of the stairs, "I decided to end her life, put her out of her misery." Shoen said that he then went outside, retrieved a metal pipe, returned to the house, and struck Kimberly on the neck with the pipe. He admitted that he thought Kimberly was alive when he struck her and "had a pretty good idea" that by hitting her he was killing her. But Shoen repeatedly denied planning to kill Kimberly and said that he "freaked out" and was not thinking about what he was doing.

Shoen was arrested on March 2 for the murder of his wife. Several weeks later, a grand jury indicted Shoen for first-degree premeditated murder in violation of Minn. Stat. § 609.185(1). This indictment was later amended to add a charge of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (1998). Shoen's original trial on these charges ended in a mistrial and his second trial was moved from the Watonwan County Courthouse in St. James to the Brown County Courthouse in New Ulm. Over Shoen's objection, the district court required him to wear a leg restraint throughout trial. In a pretrial hearing on the defense motion to remove Shoen's restraint, the state pointed out that the restraint was worn under Shoen's pant leg and was "the most [in]nocuous and hidden type of restraint that is possible." The defense conceded that the restraint was "minimally visible." Nonetheless, the defense argued that the restraint "cause[d] [Shoen] obviously some inconvenience and it makes him look in the presence of the jury as if he has got some sort of disability which probably will be interpreted as him, as being restrained."

At trial, the state presented evidence that Shoen killed Kimberly by strangling her and striking her multiple times on the head and neck with a metal pipe. Shoen testified and confirmed the admissions he had made in the March 2 interview. He again said that he attacked Kimberly after she threatened to leave him and make sure that Shoen, a lifelong dairy farmer, lost his children and his farm. At points in his testimony, Shoen said that he felt "empty" and had "no feeling" during his attack on Kimberly. At other points, however, Shoen testified that during the assault he felt rage, anger, pain, and hatred toward Kimberly.

Shoen also testified, and several witnesses confirmed, that there was no history of physical abuse between Shoen and Kimberly. The defense called multiple character witnesses who testified that Shoen had a reputation as a peaceful and nonviolent man. The defense also called a psychological expert who testified that Shoen had the type of personality that

made him susceptible to external psychological breakdown in moments of emotional overload. The expert stated that these breakdowns could result in rageful responses to emotional stimuli and could "last any period of time."

Prior to the close of evidence, the defense moved that the jury be instructed on the elements of the lesser-included crime of first-degree heat of passion manslaughter, Minn.Stat. § 609.20(1) (1998). Pursuant to the criteria set forth in *State v. Leinweber*, 303 Minn. 414, 228 N.W.2d 120 (1975), the court granted the motion. In addition to instructing the jury about the elements of first-degree manslaughter, the court informed the jury that, as an essential element of first-degree premeditated murder, the state had to prove that Shoen killed Kimberly in the absence of "heat of passion provoked by such words or acts as would provoke a person of ordinary self-control under like circumstances." During deliberations, the jury asked the court to clarify the meaning of heat of passion. In response, the court referred the jury to the definitions in the jury instructions.

The jury returned a verdict of guilty of first-degree premeditated murder. The jury did not return a verdict on the other two charges. The court sentenced Shoen to life in prison.

On his first appeal to this court, Shoen contended that he was deprived of his constitutional right to a fair trial because he had been forced to wear a leg restraint throughout trial. *See Shoen I*, 578 N.W.2d at 712–13. In addressing Shoen's claim, we noted that "[r]equiring a criminal defendant to appear in shackles or restraints is an inherently prejudicial practice that is constitutionally permissible only when 'jus-

tified by an essential state interest specific to each trial.' " *Id.* at 713 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568–69, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). We then clarified the procedural requirements that a district court must follow prior to ordering a defendant to wear restraints during trial. *See id.* at 713–14.

We first held that the district court erred by failing to state on the record its reasons for requiring Shoen to wear the leg restraint. *See id.* at 714. We then examined the record to determine whether the court's decision to restrain Shoen was nevertheless objectively justified. *See id.* at 714–15. After determining that the record did not objectively justify the use of the leg restraint, we held that the district court erred in ordering Shoen to wear the restraint. *See id.* at 715. We went on to hold, however, that "[e]ven though the district court erred in ordering Shoen to wear the leg restraint, that error is not prejudicial absent evidence that the jury knew he was wearing the restraint." *Id.* Concluding that the record before us was insufficient to determine "whether any or all of the jurors realized that Shoen was forced to wear a restraint," we remanded the case to the district court to conduct a *Schwartz* hearing on the issue.[1] *Id.* at 715–16. We then stated, "[i]f the district court determines after a *Schwartz* hearing that the jury knew that Shoen was wearing a restraint, the district court is then in the position to apply the harmless error standard to determine whether Shoen's guilty verdict is 'surely unattributable' to the restraints." *Id.* at 716 (quoting *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997)).

Consistent with our holding, the district court held a *Schwartz* hearing on May 29,

---

1. *Schwartz* hearings—post-trial hearings in which jurors are examined under oath—were originally conceived as a means of addressing concerns of juror·misconduct. *See Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 328, 104 N.W.2d 301, 303 (1960). Their applicability has since expanded into other post-trial issues involving juries. *See, e.g., Bianchi v. Nordby*, 409 N.W.2d 835, 838

(Minn.1987) (stating that a *Schwartz* hearing is appropriate to correct possible clerical errors in a jury's verdict). In *State v. Lehman*, 511 N.W.2d 1 (Minn.1994), we recognized that a remand for a *Schwartz* hearing is appropriate in cases in which the restraint of a criminal defendant is held to be improper, but the trial record fails to indicate whether the jury was aware of the restraints. *Id.* at 3 n. 1.

1998. One of the jurors had died shortly before the *Schwartz* hearing and another was on vacation and could not attend the first hearing, but did attend a separate hearing later. The remaining ten original jurors attended and testified at the first hearing. After instructing the jurors about the nature of the proceedings, the court questioned the jurors individually about what they had observed at trial. Eight of the jurors said that they had never noticed anything unusual about the way Shoen walked during trial, had never heard any clicking or rattling noises to indicate that Shoen was wearing a leg brace, had never seen Shoen wearing a leg brace, and were unaware that Shoen was wearing a leg brace. In fact, two of these jurors testified that they did not believe they had seen Shoen walk during trial. The accuracy of these last statements, however, is questionable because the record suggests that the jury was seated in the courtroom when Shoen, wearing his restraint, walked to the witness stand to testify.

One of the jurors, when asked if she noticed anything unusual about the way Shoen walked during trial, responded that in the hallway outside of the courtroom she "noticed that [Shoen] had chains on his ankles or shackles or whatever you call them." When asked if she knew the purpose of the leg restraints, she stated "[w]ell, I figured for security reasons—um—when you're convicted of a trial or a criminal act of this sort I would—um—just speculate and say this is just standard. He is not the only one and will not be the last one, it's just standard. I thought nothing more of it." The juror further testified that she had never observed Shoen shackled or restrained in the courtroom.

Another juror testified that she had never observed anything unusual about the way Shoen walked during trial but, when asked if she had seen Shoen walk with a limp, said "I'm unsure. It's possible." When asked if she was aware that Shoen was wearing a leg brace during trial, she responded, "I don't know, huh-uh." The transcript of the *Schwartz* hearing does not indicate whether this "huh-uh" was a negative or positive response.

On July 16, 1998, the district court held a second *Schwartz* hearing at which the juror who had been on vacation during the original hearing was asked about her trial observations. She testified that she did not observe anything unusual about the way Shoen walked during trial and said she was unaware that Shoen wore a leg brace.

In an order issued after the second *Schwartz* hearing, the district court concluded that the "jury's verdict was 'surely unattributable' to the leg restraint and consequently, requiring the Defendant to wear a leg brace during his trial was harmless error." Supporting this conclusion, the court found that "[a]ll eleven jurors testified that they were unaware that Defendant wore a leg brace in the courtroom." While the court noted that one juror had observed Shoen in chains in the hallway outside the courtroom, the court also found that the juror "stated that she assumed this was standard procedure and that she had no other thought about it." On appeal, Shoen challenges the district court's conclusion that requiring him to wear the restraint in the courtroom was harmless error, arguing first that an error involving the improper restraint of a criminal defendant during trial is not amenable to harmless-error analysis and second that, in any event, the error in the present case was not harmless beyond a reasonable doubt.

## I.

In *Shoen I*, we remanded the case stating, "[i]f the district court determines after a *Schwartz* hearing that the jury knew that Shoen was wearing a restraint, the district court is then in the position to apply the harmless error standard to determine whether Shoen's guilty verdict is 'surely unattributable' to the restraints."

578 N.W.2d at 716 (quoting *Juarez*, 572 N.W.2d at 292). Nonetheless, Shoen argues that an error involving improper restraints is not amenable to harmless-error analysis.

 Not every judicial error automatically requires reversal. Indeed, the United States Supreme Court has stated, "most constitutional errors can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The errors to which harmless-error analysis does not apply "are the exception and not the rule. * * * [I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 578–79, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (citation omitted).

In determining which errors are subject to harmless-error analysis, the Supreme Court has distinguished "structural defect affecting the framework within which the trial proceeds" from " 'trial error'—error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of the evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307–10, 111 S.Ct. 1246. In support of his assertion that an error involving restraint of a criminal defendant is an unquantifiable, structural defect, Shoen cites dicta from a number of cases concerning the prejudicial effects of improper restraints.

In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court, in dicta, summarized the prejudicial potential of binding and gagging a defendant in front of a jury:

> Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial

proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint.

*Id.* at 344, 90 S.Ct. 1057. The Court also commented on shackling in *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), calling it an "inherently prejudicial practice" that is an "unmistakable indication[ ] of the need to separate a defendant from the community at large." *Id.* at 568–69, 106 S.Ct. 1340. In *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992), the Court, again in dicta, recognized that the "consequences of * * * binding and gagging an accused during trial * * * cannot be shown from a trial transcript." *Id.* at 137, 112 S.Ct. 1810 (citation omitted).

 We too have acknowledged the prejudicial potential of improper restraints. In *Shoen I*, we acknowledged that "[r]equiring a criminal defendant to appear in shackles or restraints is an inherently prejudicial practice." 578 N.W.2d at 713 (citing *Holbrook*, 475 U.S. at 568–69, 106 S.Ct. 1340). In recognition of the inherent prejudice that occurs when a defendant is restrained in a courtroom, we have stated that "[s]hackling * * * should be virtually a matter of last resort." *State v. Stewart*, 276 N.W.2d 51, 61 (Minn.1979).

However, while the use of restraints may be inherently prejudicial, the practice is not, in every circumstance, constitutional error. *See Estelle v. Williams*, 425 U.S. 501, 505, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (citing *Allen*, 397 U.S. at 344, 90 S.Ct. 1057); *Shoen I*, 578 N.W.2d at 713. Indeed, had the record in the present case shown that restraining Shoen was immediately " 'necessary to prevent violence or escape,' " the district court's decision to restrain Shoen would have been proper. *State v. Coursolle*, 255 Minn. 384, 389, 97 N.W.2d 472, 476–77 (1959). The fact that

the jury may have seen Shoen wearing the restraints in the courtroom would not have been the basis for a valid objection. Thus, it is somewhat incongruous to argue that a defendant's right to appear before a jury unrestrained, even if desirable, is without exception fundamental to his ability to achieve a fair trial.

We also are not persuaded that the prejudicial potential of restraints justifies a total preclusion of harmless-error analysis. In *Fulminante,* the Supreme Court rejected that same argument in holding that an improperly admitted confession was amenable to harmless-error analysis. 499 U.S. at 312, 111 S.Ct. 1246. Although the Court acknowledged that an involuntary confession may be "devastating to a defendant," it concluded, "this simply means that a reviewing court will conclude in such a case that its admission was not harmless error; it is not a reason for eschewing the harmless-error test entirely." *Id.* Likewise, we have applied harmless-error analysis even to errors we have deemed presumptively prejudicial. *See State v. Cox,* 322 N.W.2d 555, 558–60 (Minn.1982) (holding that the state successfully rebutted the presumption of prejudice stemming from a court official's improper statements about the merits of a case in front of the jury).

Adopting Shoen's argument would also require us to ignore critical factual differences between the present case and the Supreme Court dicta on which he relies. While the dicta Shoen cites does suggest that restraints may be highly prejudicial to a criminal defendant, that dicta concerned the prejudicial potential of highly obtrusive, near total restraints such as shackling, binding, and gagging. *See Riggins,* 504 U.S. at 137, 112 S.Ct. 1810; *Holbrook,* 475 U.S. at 568–69, 106 S.Ct. 1340; *Williams,* 425 U.S. at 505, 96 S.Ct. 1691; *Allen,* 397 U.S. at 344, 90 S.Ct. 1057. In the present case, the restraint used on Shoen in the courtroom was a leg brace largely hidden underneath his pants and described as "innocuous" and at most "minimally visible." The accuracy of that description is borne out by the fact that all 11 jurors who testified at the *Schwartz* hearing stated that they were unaware of the restraint in the courtroom.

The vast majority of other jurisdictions to address this issue have found such distinctions important. Most courts that have addressed this issue have held that the mere fact that a juror improperly sees a criminal defendant in restraints is not per se a reversible error. *See, e.g., United States v. Mayes,* 158 F.3d 1215, 1226 (11th Cir.1998), *cert. denied by Byrd v. United States,* — U.S. —, 119 S.Ct. 1130, 143 L.Ed.2d 123 (1999); *Rhoden v. Rowland,* 10 F.3d 1457, 1459–60 (9th Cir.1993); *Commonwealth v. Edgerly,* 390 Mass. 103, 453 N.E.2d 1211, 1214 (1983). In harmonizing this holding with the Supreme Court's dicta on the prejudicial potential of restraints, the Ninth Circuit Court of Appeals reasoned:

> As in most judicial questions it is a matter of degree. If [the defendant] had been bound and gagged * * *, the impact upon him and his defense would have been so pervasive that the error in permitting such a practice would not be susceptible of harmless-error analysis. The chaining here, however, did not reach this degree of restraint. Consequently, we apply the general rule: Where "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." * * * Chaining, while odious and a last resort, does not strip a trial of its basic elements and, in this less extreme form, is susceptible of harmless error analysis.

*Castillo v. Stainer,* 997 F.2d 669, 669 (9th Cir.1993) (citations omitted), *amending* 983 F.2d 145 (9th Cir.1992). Consistent with this reasoning, we have recognized that the use of restraints, although improper, is presumptively harmless in at least one circumstance—where the restraint is so hidden and unobtrusive that the jury is unaware that the defendant is

wearing the restraint. *See State v. Scott,* 323 N.W.2d 790, 792 (Minn.1982).

■ Thus, while we acknowledge the prejudicial potential of restraints and again caution district courts to use them only when "the trial judge has found such restraint reasonably necessary to maintain order or security," *see* Minn. R.Crim. P. 26.03, subd. 2(c), we conclude that an error involving improper restraints is not per se a structural defect affecting the framework of trial. Accordingly, we hold that the improper use of restraints, at least under the facts of this case, is amenable to harmless-error analysis.

## II.

Having concluded that the use of improper restraints is subject to harmless-error analysis, we next examine whether requiring Shoen to wear a leg restraint was harmless beyond a reasonable doubt.

■ In *Shoen I*, we recognized that the improper restraint of a criminal defendant in front of a jury implicates the defendant's constitutional right to a fair trial. 578 N.W.2d at 713 (citing U.S. Const. amends. VI, XIV; Minn. Const. art. I, §§ 6, 7). When an error of such magnitude occurs, reversal is required unless the court determines that the error is harmless beyond a reasonable doubt. *See Juarez,* 572 N.W.2d at 291. For an error to be harmless beyond a reasonable doubt, "the guilty verdict actually rendered * * * [must be] 'surely unattributable' to the error." *Id.* at 292 (quoting *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)); *see also Shoen I,* 578 N.W.2d at 716.

■ The state argues that Shoen should bear the burden of showing that he was prejudiced by the restraints. As support, it cites *Lehman,* 511 N.W.2d at 1, where we stated that the defendant "has the burden on appeal of establishing prejudicial error entitling him to a new trial." *Id.* at 3. *Lehman,* however, is not controlling. There, although we held that the district court erred by failing to set forth in the record its reasons for ordering the defendant to appear in restraints, we nonetheless concluded, "the record on appeal affirmatively demonstrates that the trial court's decision was objectively justified." *Id.* Here, in contrast, the record did not objectively justify the court's decision to restrain Shoen. *See Shoen I,* 578 N.W.2d at 715. Thus, whereas *Lehman* involved only a procedural, largely technical error, the present case involves an error that we characterized as "inherently prejudicial" to Shoen's right to a fair trial under both the United States and Minnesota Constitutions. *See id.* at 713. With respect to trial errors of such magnitude, both we and the Supreme Court have held that once the defendant shows the error was made, the state bears the burden of showing that the error was harmless beyond a reasonable doubt. *See Sullivan,* 508 U.S. at 279, 113 S.Ct. 2078; *State v. Jones,* 556 N.W.2d 903, 910 (Minn.1996) (recognizing that with respect to constitutional errors in a criminal trial, the state bears the burden of showing the error was harmless); *State v. Sanders,* 376 N.W.2d 196, 205 (Minn. 1985) (recognizing that with respect to "presumptively prejudicial" errors, the state bears the burden of rebutting the presumption). Thus, in the present case, the state bears the burden of showing that the jury's guilty verdict was surely unattributable to Shoen's restraints.[2]

**2.** While *Lehman* does not control our analysis in the present case, the state's argument does point out an apparent discord in our case law as to who should bear the burden of showing that a trial error is harmless.

With respect to constitutional and evidentiary errors raised on direct appeal, the United States Supreme Court has long recognized that the burden of showing that an error is

harmless properly falls on the state. *See, e.g., Sullivan,* 508 U.S. at 279, 113 S.Ct. 2078; *United States v. Olano,* 507 U.S. 725, 734–35, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Recently, the Court has expanded this position by indicating that, with the possible exception of cases involving technical errors, violations of

In certain cases, the prejudicial effect of restraining a defendant in front of a jury throughout trial may be difficult to ascertain. *See Riggins,* 504 U.S. at 137, 112 S.Ct. 1810. However, for erroneous restraints to have any prejudicial effect at all, the jury first must be aware that the defendant is wearing a restraint. *See Scott,* 323 N.W.2d at 792. In the present case, the district court found that all 11 jurors who testified at the *Schwartz* hearings said that they were unaware that Shoen wore the leg restraint in the courtroom. While there were some factual inconsistencies in some of the jurors' testimony, the district court judge, as the finder of fact, was in the best position to determine the credibility of that testimony. *See Tjanetopoulos v. Margares,* 256 Minn. 176, 179, 98 N.W.2d 97, 99 (1959). Because nothing in the record suggests that the court's factual findings were clear error, we will defer to the court's finding that none of the 11 jurors who testified at the *Schwartz* hearing were aware that Shoen was wearing restraints in the courtroom.

■ Although one juror saw Shoen in "chains or shackles" in the hallway outside the courtroom, such an observation is far different from seeing a criminal defendant restrained in the courtroom throughout trial. Restraining a criminal defendant during transportation to or from the courtroom need not be justified by a showing of necessity or an imminent danger of escape. Such restraints do not affect courtroom decorum and do not interfere with the accused's ability to communicate with counsel during trial. Moreover, while the unusual sight of a criminal defendant restrained throughout trial may likely lead a jury to believe that the defendant is an especially dangerous individual, the sight of a criminal defendant restrained during transport to or from the courtroom is likely to be seen for just what it is—standard law enforcement practice. *See Kennedy v. Cardwell,* 487 F.2d 101, 109 (6th Cir.1973)

prosecutorial disclosure requirements, or ineffective assistance of counsel claims, doubts as to whether a trial error meets the requisite standard for harmlessness should, in all cases, be resolved in the defendant's favor. *See O'Neal v. McAninch,* 513 U.S. 432, 439–40, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *see generally* Harry T. Edwards, *To Err is Human, but Not Always Harmless: When Should Legal Error be Tolerated?,* 70 N.Y.U. L.Rev. 1167 (1995).

Following these cases, we too have stated that "a finding of constitutional error in a criminal trial does not require a new trial if the *state* can show beyond a reasonable doubt that the error was harmless." *Jones,* 556 N.W.2d at 910 (emphasis added); *see also State v. Scott,* 501 N.W.2d 608, 619 (Minn. 1993) (citing *Chapman,* 386 U.S. at 24, 87 S.Ct. 824). Similarly, in *Juarez* in which we purported to "clarify the standard for harmless error in Minnesota," we recognized that our harmless-error analysis was "entirely consistent with the standard articulated by the United States Supreme Court." 572 N.W.2d at 291–92. Thus, in cases in which we have examined the harmless-error doctrine in some depth, we have followed Supreme Court precedent in placing the burden on the state to show the error was harmless.

The above cases, however, stand in seeming contrast to another line of Minnesota cases

that, like *Lehman,* suggest a criminal defendant should bear the burden of showing both the error and the resulting prejudice. We first articulated this position in *State v. Loebach,* 310 N.W.2d 58 (Minn.1981). There, we concluded that the district court had erred by admitting certain evidence against the defendant, but nevertheless affirmed the defendant's conviction because the defendant had failed to show that he was prejudiced by the error. *Id.* at 64. In so holding, we stated, "[a] defendant claiming error * * * has the burden of showing both the error and the prejudice resulting from the error." *Id.* (citing *Lowe v. United States,* 389 F.2d 108 (8th Cir.1968)). In numerous cases since *Loebach,* we have seemingly applied this statement as a rule of law without acknowledging or addressing the possible conflict with traditional harmless-error analysis. *See, e.g., State v. Shannon,* 583 N.W.2d 579, 583 (Minn. 1998); *State v. Steinbuch,* 514 N.W.2d 793, 799 (Minn.1994); *Sanders,* 376 N.W.2d at 204.

Because the harmless-error standard applicable in the present case is clear, justice will be best served by waiting for another day to resolve any discord in our prior case law. Nonetheless, we note the apparent inconsistency in our previous cases and draw the attention of practitioners to it.

("The degree of prejudice to the defendant in this situation is certainly much less than in the situation where the accused sits throughout his trial before the jury in shackles."); *see also Rhoden v. Rowland,* 172 F.3d 633, 636 (9th Cir.1999).

In asserting that the restraints were not harmless, Shoen places great reliance on the fact that the juror who saw him in the hallway said that she believed Shoen was wearing the brace because he had been "convicted of a trial or a criminal act." Indeed, proper use of the term "convicted" may have suggested that, in light of her observation, the juror prejudged Shoen. Here, however, the juror's statement "convicted of a trial" causes us to doubt she was using the term in its proper sense. Shoen's claims to the contrary are refuted by the juror's additional testimony that she believed the restraints were "standard" and that she did not give the incident another thought. Moreover, the juror's hallway observations did not reveal anything that Shoen himself did not admit by testifying on direct examination about his "life in jail." In short, the records of the trial and *Schwartz* hearings show beyond a reasonable doubt that the 11 living jurors were not prejudiced by Shoen's restraint.

Shoen also argues that we must grant him a new trial because we cannot know for certain whether the deceased juror saw or was prejudiced by Shoen's restraint. Contrary to what Shoen asserts, however, courts may draw legitimate conclusions as to whether a jury was prejudiced even if not all jurors are available for the *Schwartz* hearing. *See State v. Benedict,* 397 N.W.2d 337, 340 n. 1 (Minn.1986); *State v. Olkon,* 299 N.W.2d 89, 109 (Minn. 1980). Here, even without the deceased juror's testimony, the record indicates that the possibility the deceased juror saw Shoen's leg restraint at trial was slight. The restraint was worn under Shoen's pant leg and, according to the state, was "the most [in]nocuous and hidden type of restraint that is possible." Shoen's coun-

sel conceded that the restraint was "minimally visible." None of the other jurors saw the restraint in the courtroom or noticed any effect of the restraint in the way Shoen handled himself at trial. Because the other jurors were unaware of the restraint, it is also possible to infer that the deceased juror never spoke of seeing the restraint to the other jurors.

We are also mindful that the jury was properly advised of Shoen's presumption of innocence, the state's burden of proof, and the permissible limits of the evidence they were to consider. We have no reason to believe that any member of the jury, including the deceased juror, did not abide by these instructions. Accordingly, we hold that the jury's verdict was surely unattributable to the restraint and, therefore, the erroneous use of the restraint was harmless beyond a reasonable doubt.

Affirmed.