STATE of Minnesota, Respondent,

v.

Ardelle Hope MANTHEY, Appellant.

No. A04–2468.

Supreme Court of Minnesota.

March 30, 2006.

Mark D. Nyvold, St. Paul, MN, for Appellant.

Mike Hatch, Attorney General, Thomas Ragatz, Asst. Attorney General, St. Paul, MN, Thomas Murtha, Aitkin County Attorney, Aitkin, MN, for Respondent.

## OPINION

MEYER, Justice.

Ardelle Hope Manthey was found guilty by an Aitkin County jury of first-degree premeditated murder of her husband and sentenced to life in prison. On direct appeal, Manthey asks for a new trial, arguing that she was denied her constitutional rights to due process and a fair trial by the admission of hearsay and other prejudicial evidence. She also asserts that the district court erroneously denied her motions for a mistrial based on jury knowledge of her custody status. Finally, she argues that the district court violated her right to be present at all stages of trial when the court discussed with counsel and answered a question from the jury during deliberations. We affirm Manthey's conviction because we conclude there was no plain error in the admission of unobjected-to testimony, no abuse of discretion in the court's decision to give a curative instruction instead of granting a mistrial, and no clear error in the court's post-trial finding that Manthey was present in the courtroom when the court answered a question from the jury.

Francis Manthey was shot and killed in the early morning hours of March 5, 2003, in a basement bedroom of his home in Hill City, Minnesota. The time of death was estimated by the assistant Aitkin County medical examiner to be around 3 a.m. He was shot at close range in the back of the head and upper arm with a handgun he owned and kept loaded at his bedside. No fingerprints were recovered from the gun and DNA testing showed only the presence of Francis' DNA on the gun.

The investigation into his murder proceeded for more than a year before the state charged Francis' wife, Ardelle Hope Manthey, with first-degree premeditated murder. The state's theory of the case was that Manthey was in debt because of her passion for gambling and the motive for taking her husband's life was to collect on a life insurance policy, Francis' retire-

ment account, and sole title to the family home.

The state developed evidence of Manthey's gambling activities, introducing volumes of financial information, including ATM withdrawal records, bank account records, and casino activity logs. Manthey regularly gambled at casinos and cashed checks or used ATM's at casinos and elsewhere. Bank records showed that during the four years before Francis' murder, Manthey periodically cashed several checks a day at a casino. The state argued that the financial records show that Manthey was gambling far more than the one gambling event per week she admitted, and was spending far more than she was receiving in Social Security payments.

According to the state, Manthey had used her own retirement account to pay off creditors and was regularly paying overdraft and returned check fees. Manthey's bank cancelled her cash card in late 2002 for excessive withdrawals without sufficient funds. At the time of Francis' death, the Mantheys had three judgments against them for unpaid credit card debt. Francis had an IRA account, but Manthey did not have access to it when Francis was alive.

The state presented testimony that Manthey concealed her gambling losses from her husband. Manthey once took a trip to Las Vegas without Francis' knowledge. Lisa Casper, Manthey's daughter, testified that she knew her parents had financial problems, and that Manthey borrowed money from her and her siblings to gamble. Casper also testified that Manthey borrowed against the family home and concealed it from Francis.

Francis was 69 years old at the time of his death and had been married to Manthey for almost 52 years. An accidental death insurance policy named Manthey as beneficiary and included a provision that the face value would be reduced by half after Francis turned 70 in July 2003. The state argued that the timing of Francis' death in March 2003 was intended to maximize the payout on the insurance policy.

Manthey also was the beneficiary of Francis' retirement account and would receive more than $75,000 after his death. Manthey would also inherit the family home. Lisa Casper testified that Manthey took $300 out of sympathy cards she had received after Francis' death, but never bothered to read those cards.

After Francis' death in March 2003, Manthey paid off her credit-card debt, paid for a grandchild's school tuition, bought a gravestone for herself and Francis, bought a car, furnished a new apartment for herself, and paid her grandsons to help her move. Casino records showed an increase in Manthey's gambling activity immediately after Francis' death; Manthey explained that she gambled after Francis' death to "escape." Manthey's monthly Social Security checks increased after Francis' death from $614 to $975 (total Social Security income for the couple went down, though, from $1,469 to $975).

The state established through circumstantial evidence that Manthey had exclusive access to the house the night her husband was murdered. There were no indications of a break-in—the basement door had not been forced, the windows were untouched, the rooms were not ransacked, and none of the watches or guns that Francis collected were found to be missing.

Donald Larson, who delivered the newspaper to the Mantheys, testified that the morning of the murder when he went by the Manthey home at approximately 4:35 a.m., he saw a light on in both the basement and main floor, which was unusual. Manthey first called for help at approxi-

mately 7 a.m. when she telephoned her neighbors, George Casper and his mother.

When Casper arrived at the Manthey home after the murder, he checked on Francis in the basement bedroom and found him lying on the floor. He touched Francis' arm and noticed his body was cold. Casper then left the Manthey home through the main entry door and ran to the nearby home of Daniel Kingsley, a trained emergency responder. Casper returned to the Manthey home and Kingsley arrived minutes later. According to Kingsley, when he walked toward the Manthey residence the only tracks he saw in the snow were made by Casper when he walked to Kingsley's house and back to the Manthey house. Kingsley tried to enter the house through the basement door, but it was locked.

Casper unlocked the basement door for Kingsley. Kingsley examined the body and then made a phone call to the police. He and Casper then discovered Francis' wallet lying at the bottom of the basement stairs; Manthey said she had not seen it when she first went downstairs and discovered Francis. No cash was found in the wallet, though Manthey testified that she had cashed Francis' Social Security check two days before his death and had given him $600 in cash.

Other evidence indicated that almost 100 internet visits or searches related to the word "poison" had been conducted on the computer at the Manthey residence; records of some of the searches had been deleted.

Manthey testified in her own defense and denied having killed her husband. She theorized that Francis was killed by an intruder. She had placed a quilt over the grate between the first floor, where she slept, and the basement so that the lights on the first floor would not disturb Francis. On the morning of the murder,

she went downstairs, straightened a blind on the basement door that was crooked, locked the door, picked up a flashlight that had fallen off a shelf, checked the corn stove heater, then noticed Francis' body, but did not touch him. She testified that she knew he was dead when she saw him lying next to his bed. She theorized that the killer was an intruder who needed money and used Francis' gun to kill him when he woke up. She explained that she had not heard the gunshots because the previous night she had taken two Percocet pain pills and, as a result, had experienced the best night's sleep she had in a while. A Bureau of Criminal Apprehension toxicology report confirmed that Manthey had taken Percocet on March 4–5, 2003.

Manthey knew that Francis kept a loaded gun at his bedside. Francis had shown her how to shoot the gun the summer before his death, though she testified that she had never actually fired it. Manthey claimed that she was not physically capable of shooting the murder weapon because she had chronic pain in her dominant right wrist and shoulder, and the gun was too heavy for her to lift. A surgeon who operated on her shoulder and another doctor who operated on her wrist/thumb in July 2003 testified that the surgeries were designed to relieve severe pain.

The defense produced evidence that those who knew Francis knew that he carried hundreds and even thousands of dollars in cash, that he stashed cash in his freezer at home, and that he kept numerous guns in the house. A person from the community testified that she saw a stranger at the home of one of the Mantheys' grandsons the night before Francis was killed. She said the man kept his hat pulled over his face and that after he left she never saw him again. Donald Larson, the newspaper carrier, testified that he saw a stranger about five blocks from the

Mantheys' house at around 5 a.m. on March 5. Larson told police about the individual.

Manthey voluntarily gave the police a number of statements and cooperated throughout the investigation even after police told her several weeks after Francis' death that they believed her to be "involved in this" and read her a *Miranda* warning.[1] She voluntarily gave police blood and urine samples on the day of the murder. During the time of the investigation into the murder, she called the lead investigator on the case twice to let him know that she was going out of town and again to let him know that she had returned.

Manthey and others testified that before Francis' death she gambled roughly once a week, and that on any given day it was her habit to stop gambling when she had used up the money she had brought to gamble. Manthey testified that she used her player's card every time she went to the casino; casino records tracking her card use indicate losses smaller than those shown by the Mantheys' banking records. Kathleen Casper, Manthey's friend and neighbor, testified that she never loaned Manthey money. Iralee "Dee" Clarke, Manthey's sister, testified that any time Manthey borrowed from her (or vice versa) the funds were paid back quickly. Manthey also testified that Francis never said that she could not go gambling, and that she had worked and saved her own money. She further testified she had never initiated a claim for the accidental death policy because she did not consider his death to be "accidental" and that she did not know about the death benefit on Francis' IRA before his murder.

Manthey explained that she had used the computer to research mushrooms in her yard to ensure that they were not poisonous and that grandchildren and others had used the computer as well. The BCA examination showed that websites pertaining to mushrooms had been visited.

The state used Manthey's statements to police to attack her credibility and undermine her theory of the case. In her first discussion with police the morning of the murder, she said she had had the best night's sleep she had in a long time. Later that day, she told police that she recalled waking up when she heard a loud noise at approximately 4 a.m. (which is when her medication usually wore off). She described the noise as sounding like a loud clapping on the side of the house. But she did not investigate.

The jury returned its guilty verdict on September 24, 2004. This is Manthey's direct appeal.

## I.

■ Manthey argues that her constitutional rights to due process and a fair trial were infringed upon by the admission at trial of statements that she alleges were hearsay. On appeal, Manthey takes issue with six statements admitted in the course of the state's direct examination of two of its witnesses, Lisa Casper and Mike Casper, Manthey's daughter and son-in-law:

1. "Well, ma went gambling last night." (Mike Casper);

2. "She left me a hundred dollar bill on the table." (Mike Casper);

3. Francis may have said, "Damn, she went gambling." (Mike Casper);

4. Francis was aware of Manthey's gambling problem and that some-

---

1. Six interviews were recorded and admitted at trial; others were not recorded but were referenced at trial.

times her gambling was OK and sometimes he did not like it. (Lisa Casper);

5. He was not going to let Manthey spend his retirement funds gambling. (Lisa Casper);

6. Francis said his kids would be glad to get some money when he passed. (Lisa Casper).

The statements were offered by the state to establish Francis' negative attitude about Manthey's gambling. Counsel for Manthey did not object to any of the statements.

 In the absence of an objection, we may review the admission of evidence for plain error. Minn. R.Crim. P. 31.02. The plain error standard requires the defendant to show (1) error (2) that was plain and (3) that affected the defendant's substantial rights. *State v. Strommen,* 648 N.W.2d 681, 686 (Minn.2002) (citing *State v. Griller,* 583 N.W.2d 736, 740 (Minn. 1998)). We have noted that to satisfy the third element, a defendant must show prejudice that forms the basis for a reasonable likelihood the error substantially affected the verdict. *Id.* at 688 (citing *State v. Smith,* 582 N.W.2d 894, 896 (Minn. 1998)). If all three conditions are satisfied, we proceed to determine whether it is necessary to address the error to ensure the fairness and integrity of the judicial proceedings. *State v. Vick,* 632 N.W.2d 676, 685 (Minn.2001) (citing *Griller,* 583 N.W.2d at 740).

 To constitute plain error, "the trial error must have been so clear under applicable law at the time of conviction, and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object—and thereby present the trial court with an opportunity to avoid prejudice— should not forfeit his right to a remedy." *State v. Pilot,* 595 N.W.2d 511, 518 (Minn.

1999) (quoting *Rairdon v. State,* 557 N.W.2d 318, 323 (Minn.1996)).

 Hearsay is defined in our rules of evidence as an out-of-court statement offered as evidence to prove the truth of the matter asserted. Minn. R. Evid. 801(c). The rules bar the admission of hearsay unless it fits under one of a number of exceptions, which generally reflect the recognized reliability of statements made in certain situations. *See* Minn. R. Evid. 802 (barring admission of hearsay), 803 (listing exceptions to the hearsay exclusionary rule), and 804 (same). The number and variety of exceptions to the hearsay exclusion make objections to such testimony particularly important to the creation of a record of the trial court's decision-making process in either admitting or excluding a given statement. The complexity and subtlety of the operation of the hearsay rule and its exceptions make it particularly important that a full discussion of admissibility be conducted at trial.

The six statements at issue related to Francis' feelings about Manthey's gambling. We do not conclude that the statements were clearly or obviously inadmissible hearsay. In the absence of an objection, the state was not given the opportunity to establish that some or all of the statements were admissible under one of the numerous exceptions to the hearsay rule.

Even if it can be said that the statements were each inadmissible hearsay, it is not clear that Manthey was prejudiced by their admission. The statements are not convincing evidence of Francis' negative feelings about Manthey's gambling habit and, therefore, we cannot say that their evidentiary value was particularly strong. We conclude that it was not clear that the six statements were inadmissible hearsay and, in any event, the evidentiary value of the statements was so weak that their

admission did not likely affect the verdict. We deny relief to Manthey under our plain error test.

## II.

■ Manthey asserts that her right to a fair trial was denied because the state elicited irrelevant and prejudicial evidence that Manthey had sex with Francis to appease him so that she could go gambling. On direct examination, the prosecution asked Lisa Casper if she was aware of anything Manthey would do to appease Francis so she could go gambling. Casper testified in response that Manthey would have sex with Francis. Manthey objected to the statement as speculative and lacking foundation. The court responded, "Sustained unless you can lay further foundation." The prosecution attempted to lay further foundation but was unsuccessful. Manthey did not move to strike Casper's answer, seek a curative instruction, or move for a mistrial. The court never formally admitted the appeasement statement, but it also never struck it or offered a curative instruction.

■ Manthey's argument on appeal is that the mere fact that the jury heard the objectionable answer entitles her to a new trial because the testimony was so inflammatory and improper that it substantially affected the verdict. We do not agree. The question is whether Manthey can meet her burden under the plain error test. As we recently stated in *State v. Washington,*

> [b]ecause [appellant] did not move to strike, seek a curative instruction or request a mistrial, the question becomes whether plain error occurred when the district court, having sustained the objection to the testimony * * *, did not act *sua sponte* to limit the testimony's impact by providing a curative instruc-

tion or to eliminate that impact by granting a mistrial.

693 N.W.2d 195, 205 (Minn.2005). As we noted in *Washington,* courts are not required or even advised to make such affirmative intrusions into proceedings. *Id.* We conclude that plain error did not occur because the failure of the court to act sua sponte in reaction to the objectionable testimony did not affect a substantial right requiring a new trial. Again we determine that the evidence did not present such a danger of unfair prejudice that its admission, circumscribed as it was, amounted to plain error.

## III.

■ Manthey made mistrial motions in response to two separate references to her custody status. The first occurred during cross-examination of Lisa Casper, when defense counsel asked, "So by your testimony for the last two years your mother had been answering the phone?" Lisa responded, "No. She's been in jail." Defense counsel objected, and Mike Casper, Lisa's husband, yelled, "Let's get out of here," from the gallery. Manthey said, "She's telling the truth, Mike. Leave her." Manthey's counsel moved for a mistrial, arguing that a curative instruction would be inadequate. The court did not specifically rule on the mistrial motion, but told the jury to disregard Lisa Casper's comment and those of anyone other than a witness or attorney. The court then instructed the jury:

> No member of the jury should in any way permit himself or herself to be prejudiced against the defendant because an indictment has been filed against the defendant, or because the defendant has been arrested, or because the defendant has been placed on trial by the ordinary process of law.

The court then instructed the jury on the presumption of innocence.

The second reference to Manthey's custody status occurred before closing arguments. The bailiff informed the court that a juror had told him on a cigarette break, in front of two other jurors and an alternate, that she had learned from her supervisor at work that the jury would be getting the case soon. The supervisor had heard this from one of the juror's coworkers who was in jail with Manthey. This information was relayed to the parties by the court. Defense counsel made a motion for a mistrial. The court denied the motion, and indicated that the presumption of innocence instruction again would be given during final instructions. The court noted on the record that counsel for the state and Manthey agreed not to voir dire the jurors or to inquire further.

■■■ This court reviews a trial court's denial of a motion for a mistrial for abuse of discretion. *State v. Spann*, 574 N.W.2d 47, 52 (Minn.1998). The trial judge is in the best position to determine whether an outburst creates sufficient prejudice to deny the defendant a fair trial such that a mistrial should be granted. *See State v. Graham*, 371 N.W.2d 204, 207 (Minn.1985). "[A] mistrial should not be granted unless there is a reasonable probability that the outcome of the trial would be different" if the event that prompted the motion had not occurred. *Spann*, 574 N.W.2d at 53 (citing *State v. Clobes*, 422 N.W.2d 252, 255 (Minn.1988)).

We have found that references to *prior* incarceration of a defendant can be unfairly prejudicial. *See State v. Hjerstrom*, 287 N.W.2d 625, 627–28 (Minn.1979); *see also Ture v. State*, 353 N.W.2d 518, 524 (Minn. 1984) (finding that testifying police officer's reference to questioning defendant in another incident justified a curative instruction but not a mistrial). We have not

enunciated a general rule that it is prejudicial for the jury to learn that a defendant is in jail for the crime for which he or she is on trial. Nonetheless, Lisa Casper's reference to Manthey's incarceration arguably damaged the presumption that Manthey was innocent until proven guilty. We find that whatever prejudice was created was not so fundamental or egregious as to require a mistrial and was effectively mitigated by the court's instructions. The jury was instructed to disregard Lisa Casper's comment and the court specifically blunted the impact of the comment by instructing the jury not to be prejudiced by Manthey's arrest. *See Long v. Humphrey*, 184 F.3d 758, 761 (8th Cir.1999) (discussing curative alternatives less dramatic than mistrial); *State v. Budreau*, 641 N.W.2d 919, 926 (Minn.2002) (stating our presumption that juries follow instructions).

■■■ We have recognized that the state has an obligation to caution its witnesses against making prejudicial testimony. *See State v. Underwood*, 281 N.W.2d 337, 342 (Minn.1979). Nevertheless, we cannot conclude that the state failed in its obligation. Casper's potentially prejudicial comment was made during intense, emotional cross-examination, and does not appear to have been prompted by a desire to prejudice Manthey. More specific instructions than those given by the district court could have had the effect of drawing attention to Casper's reference to Manthey's incarceration. *See State v. Haglund*, 267 N.W.2d 503, 506 (Minn.1978) (discussing the idea that a specific curative instruction would emphasize an inadvertent prejudicial reference). The second reference to incarceration, by the juror to the bailiff, confirmed that at least one juror knew Manthey was in jail pending the outcome of the trial. Generally, jurors' knowledge that a defendant is in custody pending the

outcome of a first-degree murder trial is "likely to [have been] seen for just what it is—standard law enforcement practice." *State v. Shoen,* 598 N.W.2d 370, 378 (Minn. 1999) (referring to a jury seeing defendant in restraints during transport to and from court). Further, in the absence of voir dire, we have no basis to conclude that the jury's decision was improperly prejudiced by the knowledge that Manthey was in custody. We do not find an abuse of discretion in the district court's decision to deny the motion for a mistrial and give a curative instruction because there was no reasonable probability that the references affected the outcome of the trial.

## IV.

■ During jury deliberations, the jury sent a note to the court stating, "We would like to know who pulled the covers up over the sheets on Francis's bed the morning of 3–5–03." The court reconvened to discuss the question and both attorneys agreed that the jury members should be told to rely on their memory of the testimony. Manthey does not contend that the court gave the jury the wrong answer. Rather, she asserts that the court violated her constitutional right to be present at all stages of her trial. Minn. R.Crim. P. 26.03, subd. 1; *State v. Thompson,* 430 N.W.2d 151, 152–53 (Minn.1988). Neither the transcript nor the court administrator's minutes of the proceedings affirmatively establishes that Manthey was in the courtroom during these discussions.

This court has stated that "a trial judge should have no communication with the jury after deliberations begin unless that communication is in open court and defendant is present." *Ford v. State,* 690 N.W.2d 706, 712 (Minn.2005). Whether a defendant was present for a jury question and answer is a factual determination by the trial court that this court reviews for clear error. *State v. Inman,* 692 N.W.2d 76, 79–80 (Minn.2005) (citing *State v. Thaggard,* 527 N.W.2d 804, 807 (Minn. 1995)).

In response to Manthey's contention that the record did not establish that she was present in the courtroom, the state made a post-trial motion to supplement the record. Minn. R. Civ.App. P. 110.05; Minn. R.Crim. P. 29.01, subd. 2. The court received and considered the affidavits of the state's two trial attorneys averring that Manthey was present in the courtroom during the jury communications. Manthey did not submit any evidence that she was not present in the courtroom. The court made the following finding of fact: "Based on the evidence, the court finds that Defendant Ardelle Manthey was present in the courtroom when the question was presented and answered by the court on September 24, 2004." Given the lack of an evidentiary basis for the challenge to the finding, we conclude that the court did not clearly err in its determination.

Affirmed.

GILDEA, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

HANSON, Justice (concurring).

Although I agree with the conclusion of the majority that the admission of the six hearsay statements was not prejudicial, I disagree with the majority's suggestion that the statements were not clearly or obviously inadmissible hearsay.

The six statements were all out-of-court statements supposedly made by the victim. They were apparently offered to prove that Manthey had a motive to kill the victim because the statements suggest that the victim objected to Manthey's gambling

and would not let Manthey spend his separate assets gambling. If they were not offered for this purpose, they would have no relevance to the case. Thus, they were offered to prove the truth of what was implied in the victim's statements, that the victim objected to Manthey's gambling. As such, they plainly meet the definition of hearsay and are inadmissible unless they fall into one of the hearsay exceptions.

Although the application of the hearsay rule and its exceptions can sometimes be complex, it was not complex here. The state's brief, written after taking the opportunity to reflect on the issue, does not present any sound reasons for admitting these statements. First, the state suggests that the statements were offered to prove the victim's state of mind, relying on the hearsay exception in Minn. R. Evid. 803(3). But the state fails to demonstrate how the victim's state of mind could have any relevance to Manthey's motives unless there was evidence that connected Manthey to these statements. As the comments to Rule 803(3) explain:

> The rule makes it clear that hearsay statements probative of the declarant's state of mind or emotion are not made inadmissible by the hearsay rule. The more difficult evidentiary problems arise in the determination as to whether state of mind is relevant to the issues in the lawsuit.

Minn. R. Evid. 803(3) comm. cmt.—1989. Because the victim's state of mind could only be relevant to Manthey's motives, and there is no evidence that these hearsay statements were communicated to Manthey, the statements are both irrelevant and inadmissible hearsay.

The state suggests that some of the statements might have been shown to be excited utterances, admissible under Minn. R. Evid. 803(2). But the state fails to show that the circumstances under which the statements were supposedly made would qualify them under that exception. The exception requires that the statement relate to "a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The testimony does not suggest that there was anything startling about the fact that Manthey had gone gambling. Thus, even if the state could have shown that the victim was excited when he made the statements, it could not have shown that the excitement was caused by a startling event or condition.

PAGE, Justice (concurring).

I join in the concurrence of Justice Hanson.