STATE of Minnesota, Respondent,

v.

Joseph Thomas SPANN, Appellant.

No. C0–97–329.

Supreme Court of Minnesota.

Jan. 22, 1998.

Michael F. Cromett, Asst. State Public Defender, St. Paul, for appellant.

Hubert Humphrey III, Atty. Gen., Michael O. Freeman, Hennepin County Atty., Donna J. Wolfson, Asst. County Atty., for respondent.

## OPINION

STRINGER, Justice.

On July 9, 1995, a convenience store clerk was shot and killed during an armed robbery. The robbery and murder led to the conviction of Joseph Spann (Spann) for first-degree murder, Minn.Stat. § 609.185(3) (1996); second-degree intentional murder, Minn.Stat. § 609.19(1) (1994); and first-degree aggravated robbery, Minn.Stat. § 609.245, subd. 1 (1996). On review, we are asked to consider five issues: (1) whether the court erred by not permitting impeachment of a witness as to his prior juvenile adjudication; (2) whether the court abused its discretion in denying defendant's motion for a mistrial based· upon a discovery violation by the prosecution; (3) whether a letter read by a witness during testimony should have been admitted in evidence; (4) whether the court erred in granting the state's motion to dismiss the second-degree unintentional felony murder count, Minn.Stat. § 609.19(2) (1994); and (5) whether there was sufficient evidence to sustain the conviction. We conclude that the trial court did not err in any ruling now challenged, and there was sufficient evidence to support the convictions. We affirm.

Marvin Nordine, the victim, arrived to begin his shift at the Brooks Superette gas station and convenience store in Hopkins, Minnesota at 10:53 p.m. on the day of the robbery/murder. Following his normal routine, Nordine made a cup of hot chocolate and smoked a cigarette in the back of the store. At 11:00 p.m., Nordine took over the

cash register duties from Wade Wiegert, who went into the back of the store to stock the drink coolers before leaving. At 11:12 p.m., Wiegert heard a "pop" and came out to investigate. He found Nordine lying on the floor behind the counter, bleeding from the neck and faintly calling, "Wade, I've been shot." A bullet had entered Nordine's neck and continued into the chest cavity where it perforated his pulmonary artery. Wiegert summoned emergency personnel but Nordine was pronounced dead at the scene.

The police found a 25–caliber Winchester shell casing at the crime scene, obtained the surveillance tape from the store's security cameras, and determined that $171 was missing from the cash register. After analyzing the surveillance tape, the police believed the robber to be about six feet tall and fully clothed, including a stocking cap and a shirt pulled up over the lower part of his face. Ballistics analysis indicated that the shell casing was used in a Beretta Browning or a Sesca ZZ. Only two useable palm prints were recovered from the store, neither identifiable.

After seeing news stories of the crime reporting that a small caliber handgun was used in the robbery/murder, Daniel Johnson contacted the Minnetonka police and reported that he had a 25–caliber gun at one time, and that on July 8, 1995, the day before the crime, Spann and Dan Erdahl had asked to borrow it for "some gangster shit." Johnson told Spann that Matthew Gustavson had the gun. Johnson originally told the police that he had bought the gun, but later admitted that he and Gustavson had stolen it in a house burglary.

Over the next several months, the police interviewed many people associated with Gustavson, Johnson, and Spann, but made no arrests. In late January 1996, Gustavson told the police that Spann had told him that he had committed the Brooks robbery, but he did not tell the police at that time that he had provided Spann with the gun and later buried it. In March 1996, Meghan Kohler, Gustavson's former girlfriend, made a statement to the police that Erdahl and Spann borrowed Gustavson's gun and returned it late at night on July 9, 1995, the date of the robbery/murder, and Gustavson and Joey Wilson had buried the gun a few days later. The gun had been stored in Kohler's closet for the few days following the crime and the police recovered ammunition from Kohler's room that they determined matched the casing found in the store.

The police arrested Gustavson[1] and Wilson and had them independently lead the police to the spot in the woods where the gun was buried. The weapon, a Browning semi-automatic pistol, was found inside a large pickle jar filled with isopropyl alcohol. A firearms expert determined the gun to be the weapon used in the Brooks robbery, but due to the immersion of the gun in the alcohol, no fingerprints were recovered. Based on the information from Kohler and Gustavson, the police arrested Spann and Erdahl.

At trial, Gustavson testified that on July 8 he saw Spann and Erdahl at a tent dance in Hopkins and Spann asked him for a gun to commit a robbery. Gustavson had hidden the gun in the woods earlier that day and he, Kohler, Erdahl, and Spann went to the woods to retrieve it. The next day, the day of the robbery/murder, Gustavson saw Spann at the Fina station and asked for the gun back—Spann told him that he still needed it. Later that night however, in the parking lot at Gustavson's sister's apartment, Spann returned the gun to Gustavson. As Gustavson and Kohler drove home that night, they passed the Brooks Superette, and observing the police cars and an ambulance outside, Gustavson told Kohler that was why Spann and Erdahl needed the gun.[2]

1. Gustavson was charged with second-degree intentional murder, Minn.Stat. § 609.19(1); aggravated robbery, Minn.Stat. § 609.245; and accomplice after the fact, Minn.Stat. § 609.495, subd. 3 (1996). Through a plea negotiation, the murder and robbery charges were dropped and Gustavson was placed on extended juvenile jurisdiction with probation until age 21. His sentence of 15 years was stayed.

2. Kohler's testimony varied from Gustavson's account in minor ways. Kohler remembered all the above events transpiring on July 9, and testified that the initial conversation took place at the Fina station, not the tent dance. She also thought that she and Gustavson went into Gustavson's sister's apartment before seeing Spann and Erdahl in the parking lot.

Although Kohler testified that when she asked Spann on a few occasions if he had done the Brooks robbery he denied it, several other witnesses testified that Spann admitted to them that he had committed the Brooks robbery/murder:

● Gustavson testified that he had a few conversations with Spann about the Brooks robbery and that Spann told him that he shot the clerk because the clerk was taking too long, that he thought he hit the clerk in the chest but it ended up being in the throat, and that he accidently touched the door and stopped to wipe his fingerprints off.

● Gustavson's sister, who described Spann as her best friend in the summer of 1995, testified that at some point after the robbery, Spann asked her "what [she] would say to him if he told [her] that he killed somebody." She replied that she would call the police, and Spann laughed. She thought Spann was joking. In the months that followed the robbery, she asked Spann why the police were questioning him, to which he replied he did not know and that he had not committed the robbery. Later, in November 1995, Spann admitted to her that he had lied, and that he did commit the Brooks robbery.

● C.P., who described himself as Spann's best friend, testified that at a party in October 1995 Spann told him that he and Erdahl had robbed the convenience store because Erdahl needed money and that Spann shot the clerk because he was afraid that the clerk would be able to identify him from his eyes. C.P. also testified that Spann told him that during the robbery he was fully clothed with a t-shirt covering his face, that Gustavson had given him the gun, and that he returned it to Gustavson after the murder.

● Nate Chapman testified that in December 1995 Spann had told him that he and Erdahl committed the Brooks robbery because Erdahl needed money, and that Spann said that "he heard a noise, freaked out, and next thing he knew that he had shot the man."

● Lori Pflug testified that in the fall of 1995, she asked Spann if he was involved in the Brooks robbery and he did not reply, but looked down in a shameful manner.

● Jenny Fedora testified that in December 1995 or January 1996 she mentioned to Spann that she had heard rumors and asked him if he had done the Brooks robbery. She testified that Spann responded that he did it, that Erdahl had needed money, and that when Spann was in the store he got scared and shot the clerk while Erdahl waited in the car.

● Several witnesses also testified that Erdahl made statements about the Brooks robbery. C.P. testified that Erdahl told him in November 1995 that he waited in the car while Spann robbed Brooks and that Spann seemed nervous when he came out of the store. Gustavson testified that a few weeks after the robbery, Erdahl threatened to hurt him or have someone else hurt him if Gustavson went to the police. Johnson also testified that he and Erdahl had a brief conversation in the early winter of 1995 in which Erdahl said that people had been talking to police and he and Spann would kill the people who talked.

Two letters were read in evidence,[3] the first was a letter written in late January 1996, by Gustavson to Meghan Kohler's sister, Sadie Kohler:

I, Mathew Martin Gustavson, wrongfully helped a man get away with the worst crime possible, the worst sin possible, cold-blooded murder. I have done some stupid shit in my life, not as stupid as this. I know that I deserve to go to jail for a very long time for what I did, and if thats what I deserve than thats what will happen to me. In my life right now I only want a few things, I want to spend time with the one I love on her birthday, I want to work a couple of more weeks to pay what I owe to my mother and father, I want to spend time with my sister and my nephew Alex because, truthfully, thats who I am doing this for. You say that you cant live with yourself knowing what happened that

---

**3.** Slight differences of format and wording appear in the court reporter's transcription of the letters in the trial record.

night, imagine trying to live with yourself thinking you did something (*yourself*) so wrong and so selfish you could die,[4] and at the same time losing the closest person to you, *and*, having your future, dreams, hopes and wishes lie in someone else's hands. Its hard not thinking and not being in any normal state of mind, I acceped the fact that Joe Spann killed an inosent person, without mercy, without regret, and without remorse. I will not accept that fact anymore and I will talk to the police but there are things I would really like to do first. I hope you will understand this and respect my feelings and help me to do what I want.

Matt Gustavson

If you dont understand then I will go on Monday, otherwise Id like to be with Meghan on her birthday at least. Thats all I ask. Let me know A/S/A/P

Gustavson read the letter as part of his testimony.

The second letter admitted in evidence was written by Spann to Gustavson while Gustavson was in jail:

Matt,

wuz up? I got this problem. I want you to help me with it. first tell me why you would show the police where a murder weapon is and then tell them you gave it to me to do a robbery. now the only way us for are going to get out of jail is if were found not guilty. Now if you tell youre sister to say me and dan where at her house like she's been doing all four of us will go home. I know your sister don't like me four her reason but tell her it's not going to get you out of jail. They don't have any evidence against me or dan, but tell me why you did what you did. I'm not mad at you because I know they probably played there cop tricks on you. Also explain to me about this letter they found in your house. Matt please don't testifi in court cause thats what they want. I dont know what else to say but good luck.[5]

4. A phrase was deleted from the letter at this point by agreement of the parties and the court.

5. The last line of the letter was deleted by agreement of the parties and the court.

This letter was also read by Gustavson as part of his testimony.

The defense theory throughout the trial was that Spann was not at the Brooks convenience store that night and alibi testimony was presented by Carla Scott, Erdahl's girlfriend, that Erdahl and Spann were with her and Gustavson's sister on the night of the robbery. Although Spann and Erdahl left around 9:45 p.m., Scott testified that they returned before 11:00 p.m. Gustavson's sister, Laura, also testified that the four of them were together that evening, but she was uncertain what time Spann and Erdahl returned. She also testified that at some time after the crime, she, Scott, Spann, and Erdahl were together in a car. Erdahl mentioned that the police were going to come talk to her and Scott and he reminded them that he and Spann had left a little before ten o'clock and had returned at quarter to eleven.

The jury found Spann guilty of murder in the first degree, murder in the second degree, and aggravated robbery on October 29, 1995 and Spann was sentenced to life imprisonment.

■ We consider first Spann's argument that he should have had the right to cross-examine C.P. with respect to C.P.'s prior juvenile adjudication for simple robbery when C.P. testified as to his conversation with Spann in which Spann told him that he and Erdahl robbed the Brooks store because Erdahl needed money and that he, Spann, shot the clerk out of fear the clerk could identify him. Spann claims the trial court's ruling prohibiting the cross-examination as to C.P.'s prior juvenile adjudication deprived him of his constitutional right of confrontation. Rule 609 of the Minnesota Rules of Evidence is directly on point. It allows impeachment of a witness' credibility with evidence of conviction of certain crimes, but section (d) provides that "[e]vidence of juvenile adjudications is not admissible under this rule unless permitted by statute or required by the state or federal constitution."[6] The

6. Rule 609 of the Minnesota Rules of Evidence provides:

(a) General Rule. For the purposes of attacking the credibility of a witness, evidence that

rule reflects the policy of Minn.Stat. § 260.211 (1996), defining juvenile adjudications as noncriminal and protecting juvenile adjudications from disclosure. *State v. Schilling*, 270 N.W.2d 769, 771 (Minn.1978).

Our inquiry is whether the cross-examination of C.P. on his prior juvenile adjudication fits within any of the exceptions to Rule 609(d). When the defense seeks to use the prior adjudication for a particularized attack on credibility, such as bias, prejudice or ulterior motive, the United States Supreme Court has held that a state's interest in protecting a juvenile offender may be subordinated to the defendant's constitutional right of confrontation. *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Schilling*, 270 N.W.2d at 771. In *Davis*, the crucial prosecution witness was a juvenile on probation when the crime was committed. *Davis*, 415 U.S. at 310–11, 94 S.Ct. at 1107. The defense sought to introduce the witness' juvenile adjudication to argue that he identified the defendants out of fear of his probation being revoked and to shift suspicion away from himself. *Id.* The Supreme Court ruled that evidence of the adjudication was admissible, reasoning that "[s]erious damage to the strength of the State's case would have been a real possibility" if the defense had been allowed to impeach the witness with his juvenile adjudication. *Id.* 415 U.S. at 319, 94 S.Ct. at 1111. Therefore, "the right of confrontation is paramount to the State's policy of protecting a juvenile offender." *Id.* Cases after *Davis* have generally not allowed juvenile adjudications to be used for general impeachment of credibility, however. *Schilling*, 270 N.W.2d at 772 (citing federal and state cases distinguishing general credibility impeachment from specific impeachment under *Davis*).

The trial court rejected Spann's argument at trial that he should be allowed to impeach C.P. with his juvenile adjudication because it demonstrated a general attack on his credibility[7] and was not specifically focused on bias or prejudice. In the absence of a specific challenge to a juvenile's credibility demonstrating a clear motive to falsify testimony, the interest protected in Rule 609(d) should not be subordinated to the defendant's right of confrontation. The record here indicates there is no specific basis for a challenge to C.P.'s credibility, and therefore the trial court did not err in rejecting the impeachment evidence.

■ We next address whether the trial court should have granted Spann's motion for a mistrial because the prosecution failed to disclose to the defense newly discovered oral statements in violation of Minn. R.Crim. P. 9.01, subd. 1(2)[8] (duty to disclose statements), and 9.03, subd. 2(b)[9] (duty continues during trial). The standard of review for denial of motion for a mistrial is abuse of discretion. *State v. Graham*, 371 N.W.2d 204, 207 (Minn.1985). During trial the prosecutor first learned at a noon recess of a conversation between C.P. and Spann that

---

the witness has been convicted of a crime shall be admitted only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment.

\* \* \* \*

(d) Juvenile Adjudications. Evidence of juvenile adjudications is not admissible under this rule unless permitted by statute or required by the state or federal constitution.

7. In the appellate briefs, defense counsel raises for the first time the argument that C.P. "had a reason to accuse someone else of the robbery/murder" and his "[i]nvolvement, as an aider and abettor" establishes a basis for impeachment to show bias. Although C.P. was on probation,

there is no support in the record that C.P. was a suspect or that he was involved in the crime in any way.

8. Rule 9.01, subd. 1(2), of the Minnesota Rules of Criminal Procedure addresses statements:

The prosecuting attorney shall disclose and permit defense counsel to inspect and reproduce any relevant written or recorded statements *which relate to the case* within the possession or control of the prosecution, the existence of which is known by the prosecuting attorney, and *shall provide defense counsel with the substance of any oral statements which relate to the case.* (Emphasis added.)

9. Rule 9.03, subd. 2(b), of the Minnesota Rules of Criminal Procedure provides that "[e]ach party shall have a continuing duty at all times before and during trial to supply the materials and information required by these rules."

had occurred after the grand jury indictments. Without informing the defense counsel about the conversation, the state questioned C.P. regarding the conversation during direct examination:

Q: Have you had any conversations with the defendant in this case since your testimony in front of the grand jury?

A: Yes I have.

Q: When did that conversation occur?

A: Uhm, I don't know, couple months ago.

Q: Okay. Do you remember how close it was to your testimony in the grand jury, how close in time? Was it a month later or two months later, do you recall?

A: I don't remember.

Q: Okay. What did you and the defendant talk about in that conversation?

A: Uhm, not too much. He said, "Hi" and I said, "Hi." Told me that he had read my statement.

Q: Your statement. Which—

A: From the grand jury.

Q: So he had read your grand jury testimony?

A: Yes.

Q: Okay.

A: And that—I don't know. He just told me to do what I got to do.

C.P. later confirmed in testimony that he had not mentioned the conversation to the prosecutor until the trial preparation meeting during the noon recess that preceded his testimony.

At the close of C.P.'s testimony, defense counsel moved for a mistrial based on the failure to disclose the conversation. The prosecutor admitted that a technical violation of Rules 9.01, subd. 1(2), and 9.03, subd. 2(b), had occurred, but argued that it was inadvertent and not prejudicial. The court ruled that the prosecutor should have disclosed the statement as soon as she became aware of it but denied the motion for a mistrial because the testimony was not prejudicial or inculpatory. The trial court also cited defense counsel's failure to object during the direct examination, even though there were opportunities

for defense counsel to do so before the arguably substantive remark "to do what I got to do."

■ In *State v. Lindsey* we set forth the following guidelines for the trial court to consider when ruling on a motion for a mistrial based upon a discovery violation: "(1) the reason why disclosure was not made; (2) the extent of prejudice to the opposing party; (3) the feasibility of rectifying that prejudice by a continuance; and (4) any other relevant factors." 284 N.W.2d 368, 373 (Minn.1979). Applying the *Lindsey* factors, we conclude that the court did not abuse its discretion in denying defense counsel's motion for a mistrial. The failure to disclose was inadvertent, not deliberate, the court did not find the statement at issue to be either inculpatory or prejudicial to Spann, and defense counsel had ample opportunity to object before the content of the conversation was revealed, but failed to do so. Further, the testimony falls short of our principle of law that a mistrial should not be granted unless there is a reasonable probability that the outcome of the trial would be different. *State v. Clobes,* 422 N.W.2d 252, 255 (Minn.1988). The trial court did not abuse its discretion in denying a mistrial.

■ Next we consider Spann's contention that the trial court should not have admitted Gustavson's letter to Sadie Kohler because it is inadmissible hearsay. "Rulings on evidentiary matters rest within the sound discretion of the trial court" and will be affirmed in the absence of a clear abuse of discretion. *See State v. Flores,* 418 N.W.2d 150, 158 (Minn.1988). Here we are faced with the anomaly that defense counsel objected to the admission of the physical letter itself, but agreed that the jury should be advised of the contents of the letter. Consistent with the defendant's request, the letter was read to the jury but the trial court did not admit the letter itself in evidence.[10] Even though counsel did not object to the jury hearing the contents of the letter, we review the trial court's ruling under the

10. During deliberations, the court reporter read the letter aloud at the request of the jury.

"plain error" rule.[11]

The state argues that the letter is admissible under Minn. R. Evid. 801(d)(1)(B) as a prior consistent statement because Gustavson was subject to cross-examination on various grounds—including his involvement in the robbery/murder, the fact that he obtained the gun in a house burglary, and that he received a reduced sentence in exchange for his testimony. Given the extensive cross-examination of Gustavson, we agree with the state and conclude that permitting Gustavson to read the letter aloud as part of his testimony as a prior consistent statement under Rule 801(d)(1)(B) was not an abuse of the trial court's discretion.

 Turning next to Spann's argument that the trial court erred by dismissing one of the second-degree murder counts without sufficient judicial scrutiny, we are guided by Minn. R.Crim. P. 30.01, which provides that "[t]he prosecuting attorney may in writing or on the record, stating the reasons therefor, * * * dismiss * * * an indictment with leave of the court." In *State v. Aubol,* we held that the trial court must dismiss an indictment when the prosecutor has provided the court with a factual basis therefor and the court is satisfied that the prosecution has not abused its broad discretion. 309 Minn. 323, 330, 244 N.W.2d 636, 640 (Minn.1976).

The state moved to dismiss the second-degree unintentional felony murder count, Minn.Stat. § 609.19(2), just before closing arguments. In justification, the prosecutor argued that the defense had been one of alibi— that Spann was not at the Brooks convenience store on the night of the robbery/murder—and that since there was no evidence that the shooting was accidental there simply was no basis for a charge of unintentional murder. We agree. The only evidence that could possibly support an assertion that the killing was anything other than intentional is the testimony of Chapman that Spann shot the clerk because he heard a noise and got "freaked out"—an ambiguous statement subject to a variety of interpretations. We conclude that the trial court did not err in

granting the state's motion to dismiss the second-degree unintentional felony murder count.

 Finally, we examine the evidence as a whole to determine whether it was sufficient to support the convictions. Our review consists of a very thorough analysis of the record to determine whether the evidence, viewed in a light most favorable to the jury's verdict, was sufficient to permit the jury to reach its verdict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). The evidence supporting the jury's verdict was substantial: the ballistics analysis indicating that the gun recovered from the buried pickle jar was the gun used to shoot Nordine; the testimony of Johnson, Gustavson and Kohler placing the gun in Spann and Erdahl's possession on the night of July 9, 1995; the weak alibi testimony to confirm Spann's claim of lack of involvement; the testimony of six of Spann's friends that Spann told them that he committed the Brooks robbery and murder; and the surveillance video that, at the very least, did not disqualify Spann as the killer. Viewed in a light most favorable to the conviction, we have no trouble reaching the conclusion that the evidence was sufficient to support Spann's conviction.

Affirmed.

---

**11.** Rule 31.02 of the Minnesota Rules of Criminal Procedure provides that "plain errors or defects affecting substantial rights may be considered * * * on appeal although they were not brought to the attention of the trial court."