*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0029**


State of Minnesota,
Respondent,

vs.

Raymond Joseph Traylor,
Appellant.


**Filed March 7, 2016
Affirmed
Halbrooks, Judge**


Ramsey County District Court
File No. 62-CR-14-3082

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Raymond Joseph Traylor, Rush City, Minnesota (pro se appellant)

        Considered and decided by Halbrooks, Presiding Judge; Chutich, Judge; and

Randall, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**HALBROOKS**, Judge

Appellant challenges his two convictions of first-degree criminal sexual conduct on various grounds and raises several pro se arguments. We affirm.

**FACTS**

Appellant Raymond Joseph Traylor encountered D.W. at a liquor store on the morning of April 30, 2014. After talking about smoking some marijuana, they purchased a six-pack of beer and drove in Traylor's vehicle to S.B.'s home. D.W. and S.B. were close friends and D.W. sometimes spent time with S.B. at her home. After realizing that S.B. did not have any marijuana, D.W. and Traylor left to go find some in the neighborhood. Unable to find any marijuana, they returned to S.B.'s home. Traylor, D.W., and S.B. sat in S.B.'s kitchen and talked while Traylor and D.W. drank beer. At some point, Traylor made derogatory remarks to S.B. about white people. S.B. told Traylor that she was offended, and Traylor apologized.

According to D.W. and S.B., Traylor's demeanor dramatically changed shortly after his comments about race. They testified that Traylor slapped D.W. so hard that she fell to the ground before Traylor proceeded to brutally rape and assault both D.W. and S.B. Photos taken by police after their arrival on the scene confirm that the two women sustained multiple physical injuries. D.W. was eventually knocked unconscious. At one point, Traylor locked S.B. in a bathroom that was adjacent to the kitchen. S.B. assumed that he did so in order to kill D.W. before turning his attention back to her.

S.B. had been expecting the arrival of her friend, R.N., during the time of the assault. R.N. and S.B. had been together earlier that morning, and R.N. had left to run errands before coming back to watch a movie with her. R.N. testified that the side door was locked when he arrived. He found that unusual because S.B. was expecting him, and he normally walked right in. R.N. immediately called 911 after hearing S.B. screaming and calling for him.

About two minutes after he called 911, R.N. saw an African American male leave the front of the house. R.N. ran to the front of the house and relayed the license-plate number to the 911 dispatch operator in a second call. R.N. then went inside the house and found S.B., who had visible injuries, and D.W., who was unconscious on the floor. When D.W. regained consciousness, she cried out that the two women had been raped.

Traylor testified at trial that the sex with D.W. and S.B. was consensual in exchange for money and that the victims' injuries were a result of needing to defend himself. He claimed that D.W. hit him with a purse that contained a small dog when he declined to take her to dinner and a movie later that week and that the two women teamed up like "Cagney and Lacey" to continue attacking Traylor as part of a scheme to rob him. Traylor testified that when he heard S.B. screaming for R.N., he concluded that R.N. was there to assist with the robbery, so he ran out the front door and left in his van.

Traylor was charged by complaint with two counts of first-degree criminal sexual conduct under Minn. Stat. § 609.342, subd. 1(e)(i) (2014). Although he was originally represented by a public defender, he fired his attorney and continued pro se with court-appointed standby counsel. A jury found Traylor guilty of both counts, and the district

court sentenced him to 373 months in prison and a total fine of $10,000. Traylor brought

several posttrial motions, which the district court denied. This appeal follows.[1]

## DECISION

### I.

Traylor argues that the district court erred by denying his motion for a mistrial and

his alternative request for curative instructions after D.W., during Traylor's pro se cross-

examination of her, (1) called him a sex offender, (2) derided his choice to represent

himself, and (3) urged the jury to look online at his lengthy criminal history. The denial

of a motion for a mistrial is reviewed for abuse of discretion. *State v. Jorgensen*, 660

N.W.2d 127, 133 (Minn. 2003); *State v. Spann*, 574 N.W.2d 47, 52 (Minn. 1998). A

mistrial "should not be granted unless there is a reasonable probability that the outcome

of the trial would be different." *Spann*, 574 N.W.2d at 53. As with a motion for a

mistrial, rulings concerning jury instructions are reviewed for abuse of discretion. *State*

*v. Cole*, 542 N.W.2d 43, 50 (Minn. 1996) ("The refusal to give a requested jury

instruction lies within the discretion of the district court and no error results if no abuse of

discretion is shown.").

"[T]he state has an obligation to caution its witnesses against making prejudicial

testimony." *State v. Manthey*, 711 N.W.2d 498, 506 (Minn. 2006). In *Manthey*, the

---

[1] Traylor's principal brief was filed by an assistant appellate public defender. After the brief was filed, Traylor moved to dismiss his appellate counsel. This court granted that motion, noting that he had complied with the requirements as set forth in Minn. R. Crim. P. 28.02, subd. 5. Although Traylor continues pro se, this court "must consider the brief filed by the State Public Defender's office on the defendant's behalf." Minn. R. Crim. P. 28.02, subd. 5(17).

4

supreme court found that the state did not fail its obligation with regard to witness testimony because the witness's "potentially prejudicial comment was made during intense, emotional cross-examination, and does not appear to have been prompted by a desire to prejudice [the defendant]." *Id.* Similar circumstances exist here—all of D.W.'s potentially prejudicial comments that Traylor now objects to were elicited by Traylor during intense cross-examination when he pointedly questioned D.W. about events leading up to the assault and the specific sexual acts that occurred during the assault.

Nothing in the record suggests that the prosecutor attempted to elicit objectionable or prejudicial statements. In fact, before the prosecutor called D.W. to the stand, he advised the district court outside the presence of the jury that D.W. was very "animated" and "upset," noting that the victim might have to take a break during her testimony. The district court agreed to break if necessary and cautioned Traylor to be aware of how he interacted with D.W. in front of the jury. Despite this, Traylor immediately objected when D.W. entered the courtroom because she was holding the hand of her victim advocate.

Traylor points to three different kinds of comments made by D.W. during her cross-examination as particularly prejudicial. The first involves references to Traylor as a sex offender. Traylor asked D.W. whether her presence at the liquor store during morning hours meant that she is an alcoholic. She responded by asking Traylor if he was a sex offender. D.W. repeated the question again, and the district court cautioned her to answer Traylor's question. Later during her cross-examination, D.W. again referred to Traylor as a sex offender when he showed her a picture of herself after the attack.

5

Traylor contends that this was a reference to "a title that implied he had formally been classified as such based on his previous actions." The state argues that D.W.'s use of the words "sex offender" referred to the sexual assault that Traylor was on trial for. We agree. D.W. and S.B. testified that they had never met Traylor before April 30, 2014. Not knowing Traylor before the day of the sexual assault, it is likely that D.W.'s reason for calling Traylor a sex offender was the result of what happened on April 30 rather than any knowledge of Traylor's past charges or convictions.

The second type of comment concerned references to Traylor's lack of a legal education. Specifically, D.W. made two statements about his lack of legal training: "This boy is going to be the most legal problem. I swear to God, you need to go to legal school. Make sure you go to legal school when you go to prison," and "You don't remember, but you're supposed to be your own lawyer." Traylor argues that D.W.'s statements "drew undue attention to [his] exercise of rights that are constitutionally protected." But D.W.'s references to his lack of legal education immediately followed questions by Traylor that were very volatile and confusing to D.W. For example, he asked her, "[D]o you remember telling the officer . . . when he arrived on the scene that when you woke up from being knocked unconscious . . . that you stated . . . he raped me, quote, he raped you, too, unquote?" D.W. responded that she did not understand and interpreted Traylor's question to mean whether D.W., upon waking, had asked the officer whether he had been raped too. After seeking clarification, D.W. followed with the statement regarding Traylor's lack of legal training.

6

There were also several times when D.W. answered Traylor's questions with questions. The judge repeatedly instructed her to answer Traylor's questions regardless of how difficult it was to do so. At one point, she asked the judge whether she had a right to cross-examine Traylor. It is tenuous at best to conclude that D.W.'s statements were improper commentary on Traylor's constitutional right to represent himself at trial, especially in light of the fact that Traylor did not object to these statements when they were made. It is more likely, as the record reflects, that D.W. was confused by the questions and became frustrated by Traylor's repetitive questioning.

The third reference occurred during a heated exchange between Traylor and D.W. after Traylor asked D.W. to identify herself in pictures showing close-ups of her injuries. D.W. urged the jury to look up Traylor's history on the Internet. Although the district court did not immediately give a curative instruction, on at least one occasion before D.W.'s testimony and several times after it, the district court instructed the jury not to do any Internet research. The district court also admonished the jury to "keep an open mind until you've heard or seen all of the evidence in this case, and we also need to have you decide this case solely based on the testimony and exhibits that are received here in this courtroom and from nowhere else." Nothing in the record indicates that any juror violated the district court's instructions by accessing the Internet.

D.W.'s comments were made during intense, emotional cross-examination in response to very intimate, detailed questions concerning the sexual assault. Many of D.W.'s comments were made in response to Traylor's questions reflecting his theory of defense, such as "[D]o you remember receiving $60 in cash from the defendant,

7

Mr. Traylor, for sexual acts for Mr. Traylor that you would take for yourself and [S.B.]?" and "[D]o you remember having sex—consensual sex with the defendant . . . ?" D.W.'s responses were rooted in a clear, angry disagreement with his version of events, and the jury was given an opportunity to weigh the competing versions because Traylor testified on his own behalf.

Even if we were to conclude that D.W.'s testimony was prejudicial, Traylor cannot demonstrate that the specific comments reasonably affected the outcome of the trial. The evidence against Traylor was overwhelming: the jury heard testimony from two victims who gave consistent accounts of the events; the nurse who examined the victims provided testimony that was consistent with their testimony; the victims had extensive documented injuries; R.N. provided consistent testimony and identified appellant at trial as the man he saw leave the house; the audio from the police officers who responded to the scene reflects that one of the women became highly emotional and exclaimed that they had both been raped; and Traylor's DNA was found on S.B.

The record reflects that, although D.W. was highly emotional during most of her cross-examination, the district court appropriately attempted to control her outbursts by repeatedly directing her to contain her answers to the questions asked. Additionally, it could also reasonably be construed that D.W.'s outbursts were not unfavorable to Traylor. The jury was free to determine whether or not D.W. was a credible witness.

We conclude that D.W.'s comments did not reasonably affect the outcome of the trial. The district court properly exercised its discretion by denying a mistrial or declining to issue a curative instruction in response to this testimony.

8

## II.

Traylor argues that the prosecutor committed prejudicial misconduct during his closing argument when he (1) stated that Traylor revictimized D.W. and S.B. while he was cross-examining them and (2) suggested to the jury that Traylor tailored his testimony based on the evidence he heard during trial. Traylor did not object during the closing. Accordingly, "an unobjected-to error can be reviewed only if it constitutes plain error affecting substantial rights." *State v. Ramey*, 721 N.W.2d 294, 297 (Minn. 2006) (citing Minn. R. Crim. P. 31.02). "In applying plain error analysis, we will reverse trial error only if there is (1) error, (2) that is plain, and (3) the error affects the defendant's substantial rights." *State v. Hill*, 801 N.W.2d 646, 654 (Minn. 2011). "An error is plain if it was clear or obvious." *State v. Strommen*, 648 N.W.2d 681, 688 (Minn. 2002) (quotations omitted).

Upon a showing of plain error, the burden shifts to the state to show that the error did not affect the defendant's substantial rights. *Ramey*, 721 N.W.2d at 302. If the plain-error test is satisfied, this court "will correct the error only if the fairness, integrity, or public reputation of the judicial proceeding is seriously affected." *State v. Dobbins*, 725 N.W.2d 492, 508 (Minn. 2006) (quotation omitted). When assessing alleged prosecutorial misconduct during a closing argument, "we look to the closing argument as a whole, rather than to selected phrases and remarks." *Ture v. State*, 681 N.W.2d 9, 19 (Minn. 2004).

**Revictimization**

Traylor takes issue with the prosecutor's statement that Traylor "revictimized" D.W. and S.B. during his cross-examinations of them. The United States and Minnesota Constitutions guarantee a defendant the right to due process. U.S. Const. amend. XIV; Minn. Const. art. I, § 7. A defendant is also guaranteed the right to a public trial by an impartial jury and to confront witnesses against him. U.S. Const. amend. VI; Minn. Const. art. I, § 6.

The state argues that the prosecutor's comment addressed D.W.'s and S.B.'s credibility and was not an attack on Traylor's decision to confront his witnesses. "Although prosecutors may not personally endorse witnesses, the [s]tate is free to argue that a particular witness is credible." *State v. Pendleton*, 759 N.W.2d 900, 912 (Minn. 2009). But "[i]t is misconduct for a prosecutor to attack a defendant for exercising his right to a fair trial and to encourage the jury to punish him for what the prosecutor perceives as further victimization of the victim." *State v. McNeil*, 658 N.W.2d 228, 235 (Minn. App. 2003). The record here supports the conclusion that the prosecutor was addressing the victims' credibility.

The prosecutor's comment was couched in an extensive discussion about credibility. In fact, the prosecutor used the word directly after a commentary on the role of the jury in weighing witness credibility:

> [O]ne of the things that you can take into consideration when—there's a list of—a nonexclusive list that you can take into consideration when you're evaluating the credibility of the witnesses here. Essentially: The manner; their ability to remember and know the facts in the case; their interest or lack

of interest in a case; the reasonableness of their testimony in light of all of the other evidence; and any other factors that bear on believability and weight. What it really comes down to is, you need to use your common sense and good judgment.

. . . .

Now, just to add insult to injury, they had to be questioned by the very man who did this to them. They had to endure his repeated questions, essentially revictimizing them once again. Keep that in mind when you evaluate their testimony. . . .

. . . .

It's the State's burden to prove that the defendant did these crimes, and the burden is proof beyond a reasonable doubt. It's the same burden that is in place for every criminal trial.

Because the comment was directly related to the victims' credibility, we conclude that the term was not used to punish Traylor for exercising his right to confront his accusers.

But even if we were to conclude that the prosecutor's comment was not a reflection on the victims' credibility, Traylor is not automatically entitled to a reversal of his conviction. We must also determine that the error had a significant effect on the jury's verdict.

In assessing whether there is a reasonable likelihood that the absence of the misconduct would have had a significant effect on the jury's verdict, we consider the strength of the evidence against the defendant, the pervasiveness of the improper suggestions, and whether the defendant had an opportunity to (or made efforts to) rebut the improper suggestions.

*State v. Davis*, 735 N.W.2d 674, 682 (Minn. 2007). The comment was isolated, and the evidence against Traylor was very strong. In addition to the strength of the evidence, a

prosecutor's error is mitigated by the issuance of proper jury instructions when "the trial judge cautioned the jury that it should consider only the evidence and that counsel's final argument statements were not evidence, where the evidence of guilt was adequate, and where the prosecutor's argument was otherwise proper." *State v. Ture*, 353 N.W.2d 502, 517 (Minn. 1984). Here, the district court advised the jury that "the arguments or other remarks of an attorney are not evidence," stating that "[i]f the attorneys or I have made or should make any statement as to what the evidence is which differs from your recollection of the evidence, you should disregard the statement and rely solely on your own memory." Additionally, the prosecutor reminded the jury:

> Now, you are the sole judges of the facts in this case, and I'll caution you right up front, what I say to you right now and what the defendant says to you while he's up here is not in evidence. I want you to rely on your own recollection of what the witnesses testified to.

In light of the prosecutor's closing argument as a whole and the strength of the evidence presented at trial, Traylor has not demonstrated that the prosecutor's statements had a significant effect on the jury's verdict.

**Tailoring Testimony**

Traylor argues that the prosecutor committed prejudicial misconduct by telling the jury that he tailored his testimony based on the evidence he heard at trial. A prosecutor "cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case." *State v. Swanson*, 707 N.W.2d 645, 657-58 (Minn. 2006). "Without specific evidence of tailoring, such questions and comments by the

13

prosecution imply that all defendants are less believable simply as a result of exercising the right of confrontation." *Id.* at 658. In other words, if evidence of tailoring can be found in a review of the record, then such allegations are not improper.

Here, the record demonstrates that Traylor tailored his testimony on two different, but related, points. Traylor asserted the defense of medical impossibility during his opening statement, claiming that he suffers from priapism, which has rendered him impotent and unable to become aroused. He explained to the jury that, as a result, he was unable to penetrate with the force required to commit first-degree criminal sexual conduct. He claimed that he and D.W. engaged in consensual sex in exchange for $60. Despite this theory, Traylor consistently argued in pretrial motions, posttrial motions, during sentencing, and in his appeal that the DNA evidence taken from the victims did not match his. Related to his alleged priapism, he told the district court that "[t]he DNA evidence is that I cannot—it could not have been my DNA for the mere fact that . . . I wasn't even able to get an erection."

During the trial, D.W. and S.B. testified during direct examination that Traylor's penis was soft. Traylor cross-examined S.B. about whether his penis was erect or not. The state also questioned the nurse who first examined the victims, asking whether, "based on [her] training and experience, is it possible for a male to either ejaculate or expel semen without having an erect penis?" She responded that it is. After hearing D.W. and S.B. describe his penis as soft and the nurse's explanation that DNA evidence can be obtained even if a penis is not erect, Traylor eliminated his defense of medical impossibility and focused on the theory of consensual sexual contact with the victims,

14

stating that "[a]t this time, my penis is erect—my penis has been erect. [D.W.] had given me oral sex until my penis became erect."

During his closing argument, Traylor told the jury that he had created a false story about priapism in order to protect himself from what he thought was malicious prosecution. He told the jury:

> My penis was fully erect. When I started here today, I said that my penis was not erect. I said I had a medical condition called erectile dysfunction. I was claiming impossibilities with this statement. I did that to protect myself from such malicious prosecution, and I knew that I did not want it to be discovered that these people were lying until I was allowed to let the victims get on the stand and tell you, the people of the jury, that my penis was soft. I made that up. That was conjured out of my own mind, on protecting myself from lies. I shot that to attorneys, I shot that to judges, I shot that to prosecutors, because I knew they was maliciously prosecuting me for these women's lies. There was perfectly nothing wrong with my penis the day we had sex, nothing at all, but [S.B.] and [D.W.] got on the stand and screamed his penis was soft—your penis was soft.

Traylor continued, "Their stories changed dramatically. They followed a figment of my imagination, ladies and gentleman, to fit their story to match my medical impossibilities."

Because the record clearly reflects that Traylor tailored his testimony to the state's evidence, it was not plain error for the prosecutor to tell the jury that Traylor tailored his testimony. Because Traylor has not established an error that was plain, we need not consider the remaining prongs of the plain-error analysis.

## III.

Traylor argues that the district court violated his right to a complete defense by excluding all evidence pertaining to D.W.'s 2009 misdemeanor prostitution conviction.

15

In reviewing a district court's evidentiary rulings, we examine the record for abuse of discretion. *State v. Crims*, 540 N.W.2d 860, 864 (Minn. App. 1995), *review denied* (Minn. Jan. 23, 1996). We will reverse an evidentiary error affecting an appellant's constitutional rights unless it is harmless beyond a reasonable doubt. *State v. Richardson*, 670 N.W.2d 267, 277 (Minn. 2003).

In cases involving criminal-sexual-conduct charges, evidence of a victim's previous sexual conduct is generally inadmissible except by court order. Minn. Stat. § 609.347, subd. 3 (2014); Minn. R. Evid. 412(1). But when consent of the victim is a defense in the case, a victim's past sexual conduct may be admissible (1) "to establish a common scheme or plan of similar sexual conduct under circumstances similar to the case at issue" or (2) if there is evidence of the victim's previous sexual conduct with the accused. Minn. Stat. § 609.347, subd. 3(a) (2014). Even then, the evidence "can be admitted only if the probative value . . . is not substantially outweighed by its inflammatory or prejudicial nature." Minn. Stat. § 609.347, subd. 3; Minn. R. Evid. 412(1). The burden falls on the defendant to establish the admissibility of sexual-history evidence. *Crims*, 540 N.W.2d at 868.

Traylor must demonstrate that the admission of D.W.'s misdemeanor prostitution conviction was relevant to his defense because it established a "common scheme or plan of similar sexual conduct under circumstances similar to the case at issue." *See* Minn. R. Evid. 412(1)(A)(i). "To qualify as a pattern of clearly similar sexual behavior, the sexual conduct must occur regularly and be similar in all material respects." *State v. Davis*, 546 N.W.2d 30, 34 (Minn. App. 1996), *review denied* (Minn. May 21, 1996). Evidence of

16

D.W.'s 2009 misdemeanor conviction for prostitution is not enough to support Traylor's conclusory statement that "D.W.'s prior conviction was adequate to establish a common scheme or plan." Traylor offers no other evidentiary support to bolster his claim that he agreed to pay D.W. for sex. In fact, a number of facts in the record belie this argument.

First, Traylor claims that he was somehow lured to S.B.'s home for paid sex with both D.W. and S.B. D.W.'s conviction does not establish a common scheme or plan that involves bringing men to S.B.'s home for sex.

Second, the admission of D.W.'s prior misdemeanor conviction would not have helped to explain the victims' injuries.

Third, Traylor argued posttrial that he fabricated the story about exchanging sex for money, stating that his pretrial attorney told him to say that he had consensual sex with her. The district court cautioned Traylor to think carefully before saying anything else because he was admitting to having perjured himself before the jury. Even at the sentencing hearing, Traylor denied having sex with the victims, stating that "I would just like to say that I just hope that they forgive me for getting into a fight with them, but I did not have sex with these people at all. At all."

Even if the district court erred by excluding D.W.'s misdemeanor conviction, this error was harmless beyond a reasonable doubt because the conviction was referred to at other times, and the district court did not instruct the jury to disregard the comments on those occasions. During Traylor's cross-examination of D.W., he attempted to establish that D.W. was a prostitute through the following exchange:

17

Q:      . . . [D]o you remember making a statement to me that you was a prostitute and that you were willing to have sex for money?
A:      No, sweetheart, I don't mess with—first of all, I don't—objection—
. . . .
A:      They said me and him weren't going to talk about that.

A little later during her cross-examination, D.W. admitted that she had "one prostitution situation." Therefore, the jury heard on at least two occasions that D.W. had a history as a prostitute. For these reasons, the district court did not abuse its discretion by determining that D.W.'s misdemeanor prostitution conviction was inadmissible under Minn. Stat. § 609.347, subd. 3 and Minn. R. Evid. 412(1).

**IV.**

Traylor argues that the district court's imposition of $5,000 in fines per conviction is excessive because (1) the district court did not consider his indigency and (2) the fines are punitive. The United States and Minnesota Constitutions prohibit excessive fines. U.S. Const. amend. VIII; Minn. Const. art. 1, § 5. This court reviews de novo whether the imposition of a fine violates a defendant's constitutional rights. *State v. Kujak*, 639 N.W.2d 878, 883 (Minn. App. 2002), *review denied* (Minn. Mar. 25, 2002).

The test of whether a fine is excessive is proportionality: "[A] fine is unconstitutionally excessive if it is grossly disproportional to the gravity of the offense." *State v. Rewitzer*, 617 N.W.2d 407, 413 (Minn. 2000). The proportionality analysis considers three factors: (1) the gravity of the offense and the harshness of the penalty, (2) a comparison of the contested fine with fines imposed for the commission of other crimes in the same jurisdiction, and (3) a comparison of the contested fine with fines

18

imposed for commission of the same crime in other jurisdictions. *Id.* The district court

need not make a finding that the defendant has the ability to pay before imposing a fine

as part of a sentence. *Perkins v. State*, 559 N.W.2d 678, 693 (Minn. 1997).

In Minnesota, a defendant convicted of first-degree criminal sexual conduct under

Minn. Stat. § 609.342, subd. 1, "may be sentenced to imprisonment of not more than 30

years or to a payment of a fine of not more than $40,000, or both." Minn. Stat.

§ 609.342, subd. 2(a) (2014). First-degree criminal sexual conduct was previously a

severity level 9 offense.[2] *See* Minn. Sent. Guidelines IV (2004). Other level-9 crimes

generally carry fines in the range of $30,000-$50,000. *See, e.g.*, Minn. Stat.

§§ 609.195(b) (max $40,000 for murder 3); .221 (max $30,000 fine for assault 1); .25,

subd. 2(2) (max $50,000 fine for kidnapping with great bodily harm) (2014). The

sentencing guidelines were revised in 2006, and criminal sexual conduct is now depicted

on a separate chart. *See* Minn. Sent. Guidelines 4.B (2014).

The $10,000 fine for the convictions falls well below the maximum allowable

statutory fine and is comparable to other fines in the state. As for fines in other

jurisdictions, Traylor points only to federal caselaw supporting a consideration of a

defendant's indigency. He does not provide authority for the proposition that

Minnesota's schedule of fines is unconstitutionally defective in comparison to fines for

---

[2] Traylor asserts that criminal sexual conduct in the first degree was previously categorized as a level 8 offense, but this is incorrect. It appears that Traylor is referencing a criminal-sexual-conduct conviction under the same statute but under the subdivision that governs conduct with a victim under the age of 13, which was previously a level 8 offense.

first-degree criminal-sexual-conduct convictions in other jurisdictions. For these reasons, the two $5,000 fines imposed by the district court are not constitutionally excessive.

## V.

Traylor raises six additional arguments in his pro se supplemental brief. He argues that (1) the state framed him by planting DNA evidence, (2) there was no probable cause to proceed to trial, (3) the prosecutor improperly elicited false testimony from the victims, (4) he was the subject of malicious prosecution, (5) the state forfeited its briefs by filing past the deadline, and (6) he was prejudiced when D.W. and S.B. walked through the jury box.

### DNA Evidence

In the first of Traylor's pro se claims, he asserts that the state framed him by fraudulently and illegally planting DNA evidence so that he would be charged with criminal sexual conduct. He argues that his DNA was planted on the scene and that the City of St. Paul conspired to entrap him, going so far as to say that D.W. and S.B. were "paid actors" enlisted by the government. This claim is without merit.

The state called two DNA forensic scientists who tested the evidence collected from D.W. and S.B., and they confirmed that the sample matched Traylor's DNA. Traylor declined to cross-examine them. He made no effort to discredit witness testimony at trial concerning his DNA. In both his posttrial motion to the district court and his appeal to this court, Traylor offers no factual or legal evidence supporting his claim that his DNA was planted. Nor does he offer an explanation of his decision not to cross-examine the Bureau of Criminal Apprehension forensic scientists.

20

**Probable Cause**

Traylor claims that there was no probable cause to proceed to trial because there was no police report filed with the district court. This claim is without merit. Traylor was charged by complaint in Ramsey County District Court. There is nothing atypical about this document.

**False Testimony**

Traylor argues that the prosecutor committed misconduct by improperly feeding the victims information about his erectile dysfunction that Traylor says he told his defense attorney in order to determine whether he was being framed. This argument is without merit. No evidence supports a contention that the witnesses were fed information to frame Traylor. To the contrary, the record supports the conclusion that Traylor tailored his testimony to fit the state's case.

**Malicious Prosecution**

Traylor claims that he was the subject of malicious prosecution. This claim is without merit. Traylor seems to consolidate his other claims into one overarching claim of malicious prosecution, noting that the prosecutor could have dismissed the charges, but did not. Traylor offers no legal or factual support for his contention that he was the subject of malicious prosecution.

**Filing Deadline and Prejudice**

Traylor's final two arguments are waived, as they were raised for the first time in his pro se supplemental reply brief. Issues not raised or argued in appellant's principal brief cannot be revived in a reply brief. *McIntire v. State*, 458 N.W.2d 714, 717 n.2

(Minn. App. 1990), *review denied* (Minn. Sept. 28, 1990). Similarly, issues raised "for the first time in [an appellant's reply brief in a criminal appeal]," having not been raised in the respondent's brief, are "not proper subject matter for [the] appellant's reply brief," and they may be deemed "waived" and be "stricken" by an appellate court. *State v. Vang*, 774 N.W.2d 539, 558 (Minn. 2009).

**Affirmed.**